JANE M. KELSO *vs.* BENJAMIN F. STIGAR, and others.

*Ejectment—Warrant of Resurvey—Exception—Sec. 22 of Art. 3 of the Code of Public Local Laws—Practice—Opinion of Surveyor as to Construction of Deed—Deed with Conditions—Power of Legislature—Charitable devise —Claim of Reverter—Vested rights—Declaration of Rights of 1776—Authority of Attorney.*

In the trial of the case below the plaintiffs, in support of their claim of title and right of entry, offered and read in evidence the two deeds—the one from Stigar to Cornthwaite and Hopkins, trustees, and the other from Matthews and others, trustees, to the defendant. The plaintiffs claimed to be entitled to recover fourteen undivided eighteenths, and they offered proof in support of their claim ; and the defendant offered certain deeds, among them the deed to herself from the trustees. On the application for the warrant of resurvey the plaintiffs objected on the ground that a survey was unnecessary; but the objection was overruled, and the warrant was issued. Under the warrant, extensive surveys were made, and plats returned, which were produced and offered at the trial to show that the parcel of land described from Matthews and others, trustees, to the defendant, (and which description was set out in the plaintiffs' declaration) was not within the lines of the deed from Stigar to Cornthwaite and Hopkins, trustees. To this offer the plaintiffs objected, but their objection was overruled, and they excepted. HELD :

1st. That although this exception was taken by the plaintiffs, who obtained the judgment below, it became the duty of the Court under section 22 of Article 3 of the Code of Public Local Laws, to consider and decide the question raised by the exception.

2nd. That the issuing of a warrant of resurvey and the admission of locations thereunder, were unnecessary and improper, where both parties derived their claim of title from a common source, and the description of the land sued for, and described in the declaration, was identical with that claimed by the defendant, and which she located, and in regard to which there was no question or dispute as to the location of any divisional line between the two parties.

3rd. That where there is manifest error in the grant in regard to descriptions of objects, courses or distances, the Court will inquire into the probabilities of mistake, as to the objects or courses called for, and look to the consequences which would result from rejecting the one or the other; and in this respect there is no difference between the weight to be ascribed to a call for a boundary, or matter of description thereof, when referred to as the beginning of a tract or as the terminus of one of its lines.

4th. That it is not competent or allowable for a surveyor to give an opinion as to how a deed should be construed with reference to a proper location of it, or what is the proper location of a particular deed or grant, having reference to other deeds in the case; to do so would be to assume the function of the Court.

In an action of ejectment it appeared that the plaintiffs' ancestor in 1773, deeded the land in question in trust for a religious society called "Quakers," for a burying place, and also to erect a meeting-house thereon for public worship by the same society; that by the Act of 1874, ch. 390, the trustees or their successors were authorized to sell and convey in fee simple, or lease for ninety-nine years, renewable forever, such part of the property not covered by the meeting-house, as might seem advisable, there being no probability of its ever again being used as a place of interment for the dead; and that in virtue of said statute the trustees made a deed to the defendant which was accepted by her, and was duly recorded, and she entered upon and occupied the property under the deed, and placed valuable improvements thereon, of a nature wholly different from those mentioned in and contemplated by the deed to the original trustees. HELD:

That the Act of 1874, ch. 390, was wholly incompetent to clothe the trustees with power to make a conveyance which could have the effect of divesting vested rights of property of others than those represented by the trustees.

By the terms of the Act of 1774, ch. 28, it was provided in respect of the original grantor, who had become insolvent, and was in confinement for debt, that all his real and personal estate, "either in possession, reversion, remainder, or in trust, or in which he has any claim or interest whatever, which in any manner might be subjected to the payment of creditors," shall be vested in the sheriff, as assignee, to sell and convey the same. HELD:

That the possibility of reverter in the original grantor and his heirs, cannot be said to have been divested thereby, there not appear-

Kelso *vs.* Stigar; *et al.*

ing the slightest trace of any attempt by the assignee, who sold and conveyed the real estate of the insolvent, to sell or deal with the mere possibility of reverter in any manner or form whatever, and the defendant having failed to establish the existence of an outstanding title to such possibility of reverter, or to produce a deed or record of a deed conveying such interest or to designate any one as having a title thereto.

The clause in the Declaration of Rights, adopted in 1776, prohibiting all sales, gifts, or devises for the use of religious sects or denominations, is not retroactive in its operation, and has no application to the deed from the original grantor to the trustees made in 1773.

A grantee cannot enter and hold under a deed, and at the same time repudiate the title thereby conveyed.

While the interest in reverter is a mere possibility, non-claim on the part of the heirs of the grantor, in no way operates to their prejudice.

The plaintiff in an action of ejectment, when suing as heir-at-law, must prove his descent from the ancestor from whom he claims, and must show that all the intermediate heirs are dead, without issue.

When an attorney brings a suit, or takes upon himself to appear for a party, the Court will not look further, but act upon the presumption that the attorney has authority for his action, unless there has been fraud or imposition practised, or the party himself has made objection to the use of his name.

APPEAL from the Circuit Court for Baltimore County.

The case is stated in the opinion of the Court.

*Plaintiffs' First Exception.*—The defendant called William H. Shipley, special surveyor, to whom, upon application of defendant for a warrant of resurvey, and the granting of said application by the Court, under protest of plaintiffs, the warrant was issued, and offered to introduce a certain plat, with locations, for the purpose of showing that the proper location of the land described in the deed from Matthews and others, trustees, to

Kelso, dated ――― R. T. A., ·953, fol. 249, and already in evidence, is not within the lines of the deed ·from Andrew Stigar to John Cornthwaite of 1773, referred to in the deed to Kelso; to which offer the plaintiffs objected, as well as to all the plats and return of the surveyor, but the Court (BURKE, J.) overruling the objection allowed the defendant to proceed for the purpose stated.    The plaintiffs excepted.

*Plaintiffs' Second Exception.*—The plaintiffs then offered to prove by a copy of an old map in the custody of the City Librarian, and purporting to be made by Geo. G. Presbuy, and returned by Commissioners Andrew Buckanan, John Plowman, John Deaver and others, appointed by the Legislature, and returned to the Baltimore County Court, 25th November, 1773, the same being certified as a copy under the seal of the Court, and also by what purported to be a copy of the same map now in the possession of S. J. Martenet, and with the certificate of Wm. Gibson, under the seal of the Baltimore County Court attached, that it was such copy, in connection with the Act of July 3, 1773, A. G., fol. 176, for the enlargement of Baltimore town, which was offered at the same time; that the several grants from Thomas Sligh to Saml. Young, Fielder Grant, Wm. Young, Alexander Stuart and Andrew Stigar, were all displayed on said map in different colors, and that the first line of the Wm. Young grant ran southeast instead of northeast, and that it and the Stigar grant, in three several outlines, agreed substantially with the locations of said lands as made by plaintiffs, and the defendant objecting thereto, and the plaintiffs not being able by witnesses produced for that purpose, to distinguish on said maps the land directed to be laid out by said Act from other land appearing on the said map, the Court for this and other reasons sustained the objection, and refused the said map, or either of them, to be offered in

evidence; to which ruling of the Court the plaintiffs excepted.

*Plaintiffs' Third Exception.*—The plaintiffs further offered in evidence, as tending to show the correctness of this location, a deed from Thomas Sligh to John Deaver, dated 17th of July, 1766, date to be taken in connection with any proof of possession under said deed. But the defendant objected to the same, and the Court sustaining the objection and refusing said deed to be used for any purpose, the plaintiffs excepted.

*The First and Second Exceptions* of the defendant, it is not deemed necessary to insert. The character of her *Third, Fourth and Fifth Exceptions* is stated in the opinion of the Court.

*Defendant's Sixth Exception.*—The plaintiffs offered the following prayers, which the Court granted:

1. If the jury find that the plaintiffs in this action are descendants and heirs-at-law of Andrew Stigar, and that said Stigar, in the year 1773, conveyed a certain parcel of land to John Cornthwaite and others, in trust for the uses and purposes declared in said deed, as the same was offered in evidence, and that the land sued for in this action is a part of the same land embraced in said deed from Stigar to Cornthwaite; and if they further find, that the land sued for continued in the possession of said trustees until the year 1882, and that said trustees or their successors in the trust then sold said parcel to the defendant, and that defendant took a deed therefor from said trustees, and took possession of and holds said land under said deed for her own use and purposes, and not for the uses and purposes set forth in the deed from Stigar, above referred to, then the said land reverted to the heirs-at-law of Andrew Stigar, and the plaintiffs are entitled to recover in this action such undivided interests as the jury may find they represent as such heirs-at-law.

4. The jury are instructed that the declarations of deceased persons, family Bibles, and traditions as to pedigree and relationship, when proven, are evidence to prove pedigree, and that in this case it is for the jury to decide from all of the evidence whether or not the plaintiffs are some of the descendants of the Andrew Stigar, who in 1773 conveyed to John Cornthwaite, entitled as claimed in the declaration to the quantity of estate therein mentioned.

The defendant offered eighteen prayers. The following only need be reported:

1. That there is no legally sufficient evidence in this case to prove that either of the "Andrew Stigars," testified to by the plaintiffs as being connected with them by blood, was ever seized of the lot of ground, or any part thereof, which is described in the declaration filed in this suit, and the verdict of the jury must therefore be for the defendant.

6. That it is incumbent upon the plaintiffs, (not producing in evidence a patent of the land sued for in this case, or of a larger tract or tracts including such land, nor following up such patent by the offer in evidence of deeds legally sufficient deducing title from such patent to themselves, or to some one or more persons under whom they claim by descent or descents cast and duly offered in evidence,) to show and offer in evidence in themselves a "title otherwise good;" which means a title by deeds legally sufficient, (under which the possession is in law presumed,) or by other evidence tending to show continuous, open, notorious, exclusive and adverse possession of the land in question by themselves, or those under whom they legally claim, to be offered in evidence, for more than twenty years before the beginning of the possession of the Society of Friends, or its trustees; that the deed from Andrew Stigar to John Cornthwaite and another, dated the 19th day of June,

1773, offered in evidence by the plaintiffs themselves, *by its terms raises a legal presumption,* that on the day of its date, (to wit, on the 19th day of June, 1773,) the possession of said Andrew Stigar was terminated in favor of the said John Cornthwaite and another, and of the Society of Friends therein mentioned, for the uses expressed therein; that the offering in evidence by the plaintiffs of a single deed not nine years old in the year 1773, (to wit, a deed from Thomas Sligh to Andrew Stigar, made and dated in the year 1765, and offered in evidence,) is not sufficient in law to comply with the Act of Assembly dispensing with the necessity of producing a patent from the State, or late Lord Proprietary of the Province of Maryland, nor is it an offer in evidence, (under the law governing this case,) of a "title otherwise good" as hereinbefore instructed; and the verdict of the jury must therefore be for the defendant.

7. That the deed from Andrew Stigar to John Cornthwaite and another, dated the 19th day of June, 1773, and offered in evidence by the plaintiffs, of itself raises no presumption of a "title otherwise good" in the said Andrew Stigar, or in his heirs, that it still remains as a burden of proof upon the plaintiffs to show a "title otherwise good," to the lot therein described, in order to enable the plaintiffs, (in case they prove that they are the heirs-at-law of said Stigar now in being, which it is incumbent for them first to prove, or that they are some of the said heirs, and as such now entitled to represent the said Stigar as to the lot in question,) to recover in this case the lot in the declaration described; that these plaintiffs must, nevertheless, prove the title of the said Andrew, or their own title as his legal representatives, (as to said lot in question,) by showing a title "otherwise good," for the period of more than 20 years before the execution of the said deed from Andrew Stigar to John Cornthwaite and others; and that such title be

legally deduced to the said Andrew before the execution
of said deed to Cornthwaite and others; that this is the
meaning of the Act of Assembly presuming a patent
"in favor of the party showing a title otherwise good,"
and that inasmuch as no legally sufficient evidence has
been offered in this case that the said Andrew Stigar, or
his assignors, had any title at all before the year 1765,
to the lot in question, (to wit, the deed from Thomas
Sligh to Andrew Stigar, dated the 17th day of March,
1765, and offered in evidence by the plaintiffs,) the ver-
dict of the jury must be for the defendant.

8. That the express mention by the plaintiffs in their
declaration in this case, of the deed from Joseph Mat-
thews and others, trustees, to Jane M. Kelso, the de-
fendant, by names of parties, date and place of record,
is a setting up of said deed by the plaintiffs themselves,
sufficient to estop the plaintiffs from denying the legal
validity of such deed, and the title of the said Jane M.
Kelso thereunder; and their verdict must therefore be
for the defendant.

9. That, notwithstanding they may find that the
defendant pretends to hold the premises mentioned in
the declaration in this case, under color of a deed from
Joseph Matthews and others, trustees of the Society of
Quakers or "Friends," under the trusts set forth and
created by the terms of the deed from Andrew Stigar to
John Cornthwaite, and another, dated the 19th day of
June, 1773, both of which deeds have been offered in
evidence by the plaintiffs themselves, yet, the said deed
from said trustees to the defendant is a *void deed,* so far
as it purports to destroy such trusts, and passed no title
as against such trusts. That the said trusts are still in
legal force and effect, notwithstanding said deed to the
defendant last mentioned, and so offered in evidence, to
bind all the land described in the said deed by which
said trusts were created and offered in evidence as afore-

said, and are therefore a flat bar to the plaintiffs' right to recover in this case; and the verdict of the jury must therefore be for the defendant.

10. That the deed from Andrew Stigar to John Cornthwaite, and another dated the 19th day of June, 1773, and offered in evidence by the plaintiffs themselves (there being no legally sufficient evidence offered in this case that the trusts thereby created have ever been legally terminated,) is a flat bar to the plaintiffs' right to recover in this case; and the verdict of the jury must therefore be for the defendant.

The Court refused to grant the foregoing prayers of the defendant. To this refusal, as also to the granting of the plaintiffs' prayers, the defendant excepted, and the verdict and judgment being for the plaintiffs, she appealed.

The cause was argued before ALVEY, C. J., MILLER, ROBINSON, IRVING, BRYAN, and McSHERRY, J.

*Alfred S. Niles*, and *Frederick W. Story*, (with whom was *Robert H. Smith*, on the brief,) for the appellant.

The following authorities were cited: *Friend vs. Friend*, 64 *Md.*, 321; *Wilson vs. Inloes*, 6 *Gill*, 161; *Hammond vs. Ridgely*, 5 *H. & J.*, 245; *Thomas, Lessee vs. Godfrey*, 3 *G. & J.*, 142; *Wood vs. Ramsey*, 71 *Md.*, 19; 2 *Poe's Plead. and Prac.*, sec. 324; *Hoffman vs. Combs*, 9 *Gill*, 287; 1 *Greenleaf on Ev.*, secs. 23, 24, 26, 211; *Alexander vs. Walter*, 8 *Gill*, 239, *and note in Brantly's Edition;* *Casey's Lessee vs. Inloes*, 1 *Gill*, 430, 493, 494; *Cecil vs. Negro Rose*, 17 *Md.*, 92; *Carroll vs. Norwood*, 1 *H. & J.*, 167; *Act of* 1715, *ch.* 47; *Nutwell vs. Tongue*, 22 *Md.*, 419, 444; *Lannay's Lessee vs. Wilson, et al.*, 30 *Md.*, 536, 546; *Austin vs. Cambridgeport Parish*, 21 *Pick.*, 215; *Rice vs. Boston & Worcester R. R.*, 12 *Allen*, 147; *Underhill vs. Saratoga and Washington R. R. Co.*, 20 *Barbour*, 455;

Kelso *vs.* Stigar, *et al.*

*Ruch vs. Rock Island*, 97 *U. S.*, 695; *Hooper vs. Cummings*, 45 *Maine*, 359; *Gwynn vs. Jones' Lessee*, 2 *Gill & J.*, 173; *Hammond vs. Hammond*, 2 *Bland*, 338; *Insolvent Estate of Conrad Leiman*, 32 *Md.*, 225; *Weaver vs. Leiman*, 52 *Md.*, 714; *Charles River Bridge vs. Warren Bridge*, 7 *Pick.*, 470; *Bank of U. S. vs. Dandridge*, 12 *Wheat.*, 70; *New Central Coal Co. vs. George's Creek Coal and Iron Co.*, 37 *Md.*, 556; *Langley, et al. vs. Jones, et al.*, 33 *Md.*, 171; *Kershner and Kurfman vs. Kershner's Lessee*, 36 *Md.*, 309; *Ahern vs. White*, 39 *Md.*, 409, 423.

*Charles H. Stanley, D. G. McIntosh,* and *Samuel Snowden,* for the appellees.

The following authorities were referred to: *Crane vs. the Lessee of Morris, et al.*, 6 *Peters*, 611; *Carver vs. Jackson*, 4 *Peters*, 83; *Shelley vs. Wright, Willes*, 9; *Marchioness of Annandale vs. Harris*, 2 *P. Wms.*, 432; *Funk vs. Newcomer, et al.*, 10 *Md.*, 317; *Blight's Lessee vs. Rochester*, 7 *Wheat.*, 543; *Second Universalist Society vs. Dugan*, 65 *Md.*, 472; *Doe vs. Oliver*, 2 *Smith's Lead. Cases*, 609, (*Ed.* 1855;) *Elwood and Wife vs. Lannon's Lessee*, 27 *Md.*, 200; *Johnson vs. Watts*, 1 *Jones, Law*, (*N. C.*,) 228; 2 *Greenleaf on Ev.*, sec. 307; 1 *Poe on Plead. & Prac.*, 183–4; *Hall vs. Sewell*, 9 *Gill*, 146; *Winchester, &c., vs. Union Bank of Maryland*, 2 *G. & J.*, 73; *Kennedy vs. Boggs*, 5 *H. & J.*, 411; *Dolan and Foy vs. Mayor, &c., of Baltimore*, 4 *Gill*, 394; *Cornelius vs. Ivins*, 26 *N. J.*, (*L.*,) 376; *Southard vs. Central Railroad Co.*, 26 *N. J.*, (*L.*,) 13; *Stearns vs. Harris*, 8 *Allen*, 597; *Kip, et al. vs. Hirsh*, 103 *N. Y.*, 565; *Chaplin vs. Shoot*, 3 *H. & McH.*, 350; *Wood vs. Grundy*, 3 *H. & J.*, 13; *George's Creek Coal and Iron Co. vs. Detmold*, 1 *Md.*, 234; *Wilson, et al. vs. Inloes, et al.*, 6 *Gill*, 165; 1 *Greenleaf on Ev.*, sec. 139; *Starke on Ev.*, *page 305;* 3 *Wait's Actions and Def's*, 17; *Thomas' Lessee vs. Godfrey*, 3 *G. & J.*, 331; *Connelly vs. Bowie*, 6 *H. & J.*, 143; *Rogers vs. Moore*, 7 *H. & J.*, 146;

*White vs. Luning,* 93 *U. S.,* 514; *Shook vs. Pate, et al.,* 50 *Ala.,* 91; *Stewart vs. Spedden,* 5 *Md.,* 433; *Dorsey, et al. vs. Harris,* 22 *Md.,* 85; *Citizens' National Bank vs. Hooper, et al.,* 47 *Md.,* 101; *Reed vs. Stouffer,* 56 *Md.,* 236; *Cowell vs. Springs Co.,* 100 *U. S.,* 55; *Syester, Trustee of Cushwa vs. Brewer, et al.,* 27 *Md.,* 288; 2 *Black. Comm.,* 109; 4 *Kent's Comm.,* 10; 2 *Lead. Cases on Am. Real Prop.,* 26; *Shattuck vs. Hastings,* 99 *Mass.,* 23; *Hamilton vs. Rogers,* 8 *Md.,* 301; *Stewart vs. State,* 2 *H. & G.,* 114.

ALVEY, C. J., delivered the opinion of the Court.

This is an action of ejectment brought by parties claiming to be descendants of Andrew Stigar, long since deceased, against the appellant, the defendant below, for the recovery of certain undivided interests in a parcel of land in the City of Baltimore. The parcel of land sued for is described in the declaration by metes and bounds, courses and distances, and as being the same piece or parcel of land described in a certain deed from Joseph Matthews, and others, trustees, to the defendant, bearing date December 23d, 1882, and which deed was duly recorded in the land record referred to.

The foundation of the claim and supposed right of entry arises, as contended by the plaintiffs, by way of *reverter,* occasioned by the diversion from the uses and purposes for which the land in question was originally conveyed by Andrew Stigar, the ancestor, to John Cornthwaite and Gerard Hopkins, and their heirs, in trust, by deed dated the 19th of June, 1773.

That deed was made for a consideration expressed, and it declared the uses and purposes of the land granted to be "for and to the use of and purposes following, that is to say, for the use of the society of Christian people called Quakers, inhabiting and dwelling in and near the town and county of Baltimore, in the province aforesaid, *to enclose and keep the same for a burying place,* to bury or

inter those of the same society that may from time to
time depárt this transitory life, *and also to erect or build
a meeting-house for the same society of people,* for the public
worship of Almighty God, or such other improvements
*as they, the said society, may think proper."*    The Quakers
entered into possession, and held and used the ground
as the property of the society, and conveyances were
made from time to time to keep up the succession of
trustees; and certain special Acts of the General Assem-
bly of the State were obtained to confirm rights sup-
posed to require such confirmation, and to confer rights
as to the use and disposition of the property.    Acts 1793,
ch. 20; 1812, ch. 158; 1821, ch. 130; 1852, ch. 268, and
1874, ch. 390.   In the preamble to the last mentioned
Act all the preceding legislation upon the subject is
recited, and the Act then, in its preamble, recites:

"Whereas, since the purchase of the burial ground out
of the limits of the city, there have been but few inter-
ments, and none of late years, within the burial ground
on said property, and no probability of its ever again
being used as a place of interment for the dead; and,

"Whereas, both of said meetings, the one worshiping
in the meeting house on said property, and the other
worshiping in the meeting house on Lombard street,
comprising the monthly meeting of said Society of
Friends, being desirous of disposing of a portion of said
property not covered by the meeting house, for the pur-
pose that out of the proceeds of sale or lease, of giving
education to the children of parents, one or both of whom
may be members of the Society of Friends; and,

"Whereas, John C. Turner, William Riley, John
Brown and Joseph Matthews, having been appointed by
their respective meetings trustees, the legal title to
said property is vested in said trustees;" therefore it
was enacted that the trustees above named, or their suc-
cessors, were thereby authorized to sell and convey in

fee simple, or lease for ninety-nine years, renewable for-ever, such part of the property belonging to the monthly meeting of the Society of Friends, in the City of Balti-more, of which they were the trustees, not covered by the meeting house now standing thereon, in such lots, parcels or portions as to them, or their successors, might seem advisable, and to appropriate the proceeds to the purpose in the foregoing preamble mentioned. And all laws inconsistent with the Act were declared repealed.

It was by virtue of authority supposed to be derived from this Act of 1874, that the trustees of the Society of Friends made the deed to the defendant of the 23d of December, 1882. That deed makes special reference to the deed of Andrew Stigar to the trustees, of the 19th of June, 1773, and recites the fact that the trustees ex-ecuting the deed were the successors of the trustees named in the deed from Stigar to the trustees in 1773, and also of the trustees named in the Act of 1874, ch. 390; and without which right of succession, of course, there was no right to convey. The deed to the defend-ant is for part of the lot of ground conveyed and described in the old deed from Stigar to the trustees in 1773, and conveys the estate in fee simple, and describes the part conveyed by metes and bounds, courses and distances, and which description is the same as that set out in the declaration of the plaintiffs. The deed declares in terms that the part conveyed is part of the parcel conveyed by Stigar to the trustees, referring to that deed specifically.

The deed to the defendant was accepted by her and was duly recorded, and the defendant entered upon, and has used and occupied the property under the deed; and she still holds possession thereof, and has placed valua-ble improvements thereon of a nature wholly different from those mentioned in and contemplated by the deed from Stigar to the original trustees. It is because of this diversion from the original purpose of the grant, and the

ceasing to use the property for the purposes for which it was originally conveyed to the trustees, that the descendants of Andrew Stigar now claim that they are entitled by way of reverter to the estate.

In the trial of the case below, the plaintiffs in support of their claim of title and right of entry, offered and read in evidence the two deeds—the one from Andrew Stigar to Cornthwaite and Hopkins, trustees, and the other from Matthews and others, trustees, to the defendant. The first of these deeds came under consideration of this Court in the recent case of the *Second Universalist Society vs. Dugan*, 65 *Md.*, 460. The trustees for the Society of Friends or Quakers in Baltimore, by authority of the society, and under the supposed power conferred by the Act of 1852, ch. 268, disposed of a part of the ground acquired from Stigar, and which, by mesne conveyances, became vested in the appellant in that case, and the latter contracted to sell the same to the appellee in that case, and the question was, whether a good, marketable title could be made. And this Court, mainly upon the authority of the previous case of *Reed, Howard, et al. vs. Stouffer*, 56 *Md.*, 253, held, that the title was not such as the appellant in that case could sell, as a clear marketable title, by reason of the defeasible nature of the titles conveyed by the two deeds in question there, the one from Stigar to the original trustees of the Quakers, and the other from Deaver to the same trustees for the same purposes as those declared in the deed from Stigar. In that case, this Court said: "There having been a clear diversion of the property from the uses to which it was devoted by the original deeds, the rights of the heirs-at-law of the original grantors of the property, who, from the great lapse of time, may be supposed to be dead, to have the land again by *reverter*, have arisen and cloud the title of the appellant. It does not appear that the heirs of Stigar or of Deaver have failed, or that

the reversion had escheated to the State before the Act of 1852." It was further held that the Act of 1852 could not have the effect of divesting vested rights of individuals, and thus make the alienations pursuant to that Act effectual in conferring a good and indefeasible title.

It is certainly true, that that decision is not to be treated as at all binding upon the defendant in this case, otherwise than as a mere precedent, affording persuasive reason to the same conclusion. The defendant not being a party to that case, nor to the deed made by the trustees under the Act of 1852, is in no manner concluded by that decision; and if we saw sufficient reason for coming to a different conclusion in this case, we should not hesitate to give the defendant the benefit of that conclusion. But we perceive no such reason as would justify a different conclusion in this case; and the Act of 1874, ch. 390, equally with the Act of 1852, ch. 268, was wholly incompetent to clothe the trustees with power to make a conveyance which could have the effect of divesting vested rights of property of others than those represented by the trustees.

The plaintiffs in this case claim to represent and to be entitled to recover fourteen undivided eighteenths, the whole into eighteen parts to be divided; and they offered proof in support of their claim; and the defendant offered certain deeds, among them the deed to herself from the trustees of December 23d, 1882.

The defendant contests the alleged right of the plaintiffs to recover upon several grounds: they will be considered in their order.

1st. That the parcel of ground sued for is not sufficiently identified and located as being part of the lot of ground conveyed by the deed of Andrew Stigar to Cornthwaite and Hopkins, trustees. And this question has been raised on locations made under a warrant of resurvey issued at the instance of the defendant.

Kelso vs.· Stigar, et al.

It appears that on the application for the warrant of resurvey the plaintiffs objected, because, as they contended, a survey was unnecessary; but the objection was overruled, and the warrant was issued. Under the warrant very extensive and complicated surveys were made, and plats returned, which were produced and offered at the trial, for the alleged purpose of showing that the lot or parcel of land described in the deed of Matthews and others, trustees, to the defendant, (and which description is set out in the plaintiffs' declaration,) is not within the lines of the deed from Andrew Stigar to Cornthwaite and Hopkins, trustees. To this offer the plaintiffs objected, as they had objected to the issuing of the warrant of resurvey; but their objection was overruled, to which they excepted. And though this exception is taken by the appellees in this case, who obtained the judgment below, by the Public Local Law for Baltimore County, where the case was tried, it is made the duty of this Court to consider and decide the question raised by the exception. Code of Public Local Laws, Art. 3, sec. 22.

In the ruling as stated in this exception there was manifest error; and error, too, that involved the trial of the cause in great and unnecessary perplexity and confusion, as is amply shown by the record and plats produced in this Court.

The supposed difficulty in the locations that have been made do not arise in the location or identification of the land claimed and described in the declaration, but in regard to the location of the beginning line of the deed from Stigar to the trustees. That beginning, according to the call, is at the end of John Deaver's N. 73° E. 10 perches line of one acre of ground, and where there was at the time of the deed made, a stone put down, and running from said stone N. 73° E. 12 perches, &c. There has been no effort to show what has become of the

stone, or where it stood.    But the defendant has under-
taken to arrive at this beginning by locating in a par-
ticular way certain lines of two deeds of prior dates, of
different parties, and for other land.    The first of these
deeds is that from Sligh to Young, dated Nov. 8, 1759,
and the other is from Sligh to Stigar, dated the 16th of
March, 1765, the latter deed calling to bound on the
land of the former deed reversely two courses, viz., N.
2° 45' E. 27 perches; N. 58° 30' W., 3¼ perches, (this
latter being the first line in the deed from Sligh to
Young,) unto the end of the S. 17° E. 22 perches line
of a part of Mountaney's Neck, by conveyance of that
date, made by Sligh to John Deaver; thence bounding
on that part N. 17° W. 22 perches, to the end of the N.
73° E. 10 perches line of the said parcel of land; thence
bounding on that line S. 73° W. 10 perches, and then
north by a straight line to the beginning.

The whole apparent difficulty, as made by the location
of the defendant, is in the manner of locating the course
of the first line of the deed from Sligh to Young.    That
directs the course north, without call for any object at
the end of the line, nor is there any call at the end of
the second line, which calls to run south; whereas, ac-
cording to the actual survey made of the ground, having
regard to all the other calls, courses and distances of the
deed, the course of such first line should be south instead
of north; and this, according to the testimony of the
surveyors who made the survey, is the only mode of
location by which to embrace the area, and gratify all
the other calls, courses and distances of the deed.    The
defendant did not attempt to locate and define the area
of ground conveyed by the deed of Sligh to Young, but
only located the two first lines thereof, without any
attempt to close the survey, to test the accuracy of the
location of the two lines surveyed.    Now, according to
well established principles of location in this State, as

well as elsewhere, where there is manifest error in the
grant in regard to descriptions of objects, courses or dis-
tances, the Court will enquire into the probabilities of
mistake, as to the objects or courses called for, and look
to the consequences which would result from rejecting
the one or the other.   And in this respect there is no dif-
ference between the weight to be ascribed to a call for a
boundary, or matter of description thereof, when referred
to as the beginning of a tract or as the terminus of one
of its lines.   An error of description in a survey, says
this Court in *Wilson vs. Inloes*, 6 *Gill*, 121, 165, 166,
adopted in a patent or grant, manifestly founded in mis-
take or falsehood, is insufficient to control other calls
and expressions inconsistent therewith, and where the
assumption of mistake in a single description, harmo-
nizes all the rest of the grant, the Court will make such
assumption.   *Ib.*   And the same principle is fully
sanctioned in the case of *White vs. Luning*, 93 *U. S.*,
514, where it was held, that as it was manifest, from
actual survey, that there was error in the course given,
in such case, in order to close the survey and maintain
the grant, a course that was described as *east* should be
read *west*.   It must be borne in mind that the north 58°
30′ E. 18 perches line, in the deed to Young is not a call
made in the deed from Stigar to the trustees in 1773, nor
is that line mentioned in this latter deed, nor is the deed
for adjoining land; but that line is resorted to and
attempted to be located by a north course; and when
locating the subsequent deed from Sligh to Stigar, in
which that first line in the deed to Young is referred
to, as furnishing the course reversely for one of the
lines in the later deed, the defendant disregards the
course, and treats the course as erroneous in the later
deed of Sligh to Stigar.   In thus reaching the end of
John Deaver's north 73° E. 10 perches line of the one
acre of ground conveyed to John Deaver, referred to in

the deed from Stigar to the trustees, as the beginning of the lines of that deed, according to the defendant's location, the result would be to throw the lines of the lot 'conveyed by Stigar to the trustees some twenty perches further north than they really are; and thus show that the ground in question is not, by what is denominated legal locations, embraced in the lot conveyed by Stigar to the trustees.

We have thus fully stated the principal question made on the locations, and which was much discussed by counsel at the bar; but we are at a loss to perceive in what respect the locations that have been made are material or necessary to the fair trial of this case. This is in no sense a case of disputed boundary or of a divisional line of the land claimed, as contemplated by the statute law of this State.

Prior to the Act of 1852, ch. 177, our system of location of controverted land titles had become exceedingly artificial and technical, and in many cases not only produced delay and embarrassment, attended with onerous costs in preparing cases for trial, but often offered the means of defeating the efforts to attain justice. To remedy this evil in our practice and procedure, the Legislature, by the Act just referred to, and the subsequent Acts of 1872, ch. 346, and 1882, ch. 372, now embodied in the Code, adopted provisions with a view of simplifying the former practice of location, and of restricting the occasions when warrants of resurvey should issue.

By section 77 of Art. 75 of the Code, it is provided: "No warrant of resurvey shall issue in any action of ejectment unless the Court shall be satisfied that there is a dispute about the location of the lands *claimed in said action;* nor shall any issue in other actions, unless there is a dispute about the location of the lands, for the injury of which damages are claimed; or unless the Court shall be satisfied that plats are necessary for illus-

tration." In the next section of the same Article it is provided: "In any action where the parties hold or claim *under the same title* the lands in dispute, no warrant of resurvey shall issue, except in cases where the parties claim different parcels under the same title, and it appears to the Court *there is a dispute about the location of the divisional line or lines."* The statute then provides that the party upon whose application a warrant of resurvey shall issue in any action, *shall first make the location of his claim and pretension,* and such other location as he may think necessary to bring the cause *fairly to trial.* And in the following section it is provided that if either party shall make any surveys or locations which the Court may deem unnecessary, such party may be required to pay the cost thereof.

From these provisions of the Code, it is very clear that it is incumbent upon the party applying for a warrant of resurvey to furnish evidence satisfactory to the Court of the fact that there is a *bona fide* dispute about the location of the property claimed, or the divisional line thereof, and that the Court ought not to grant the warrant of resurvey unless such satisfactory evidence be furnished. And if the warrant be issued, in the execution thereof, it is incumbent upon the party upon whose application it is issued, first to make location of his claim and pretension, and such other location as may be deemed necessary to a fair trial of the cause, before the opposite party can be required to proceed. Here, in the nature of the case, there could be no necessity for the issue of the warrant or the surveys thereunder. The description of the land sued for is identical with that claimed by the defendant under the deed to her from the trustees, and which she locates, and about the location of which there is no conflict or dispute whatever. That the land embraced by the deed to her from the trustees *is part* of the land conveyed by the deed of Stigar to Cornth-

waite and Hopkins in 1773, is a fact expressly stated on the face of the deed under which she holds, and in regard to which there is no question or dispute as to the location of any divisional line between the two parts. Both parties derive their claim of title from and through one common source, and hence there is no necessity or requirement of tracing the title back of that of Andrew Stigar at the date of the deed from him to the trustees. There is no proof of any paramount title in the defendant; and as the holding of the latter is under and by virtue of the deed from the trustees of the Quakers, they deriving title under the deed from Stigar, and the location of the deed to the defendant being undisputed, we can perceive no reason or propriety for the use of locations as means to effect a fair trial; the whole and only question being who had the better title to the lot described in the deed to the defendant. On the contrary, such locations as have been made were well calculated to confuse the jury. We think they were immaterial to the fair trial of the case, and should have been rejected. They simply raised collateral and immaterial issues.

2dly. It is next contended that the estate by reverter sued for never vested in the heirs of Andrew Stigar, the original grantor, but that the right of entry for such estate is outstanding in some third party—the same having been transferred, as contended, by certain insolvent proceedings had for the relief of Andrew Stigar in his life-time.

The supposed foundation for this contention is afforded by the Act of Assembly of 1788, ch. 17, passed for the relief of Andrew Stigar and others, who were then confined in jail for debt; and by the Act the parties were declared to be entitled to the relief prayed by complying with the terms and provisions prescribed by the preceding insolvent debtor's Act of 1774, ch. 28. By the terms of the Act of 1774, it was provided "that all the

real and personal estate of such prisoner, either in possession, reversion, remainder, or in trust for him or her, or in or unto which he or she has any claim or interest whatever, or *which in any manner, may, can, or might be subjected to the payment or satisfaction of creditors*, and also all causes of action whatever, &c., shall be vested in the sheriff,'' as assignee; and the sheriff was then empowered and required to proceed to '' sell and convey the lands, tenements and hereditaments for such estate, use, interest, right or title as aforesaid.''

The first question naturally suggested is, whether the provisions of this Act of 1774, ch. 28, contemplated and embraced a prospective uncertain estate by reverter, such as that which has subsequently accrued under the terms of the deed from Stigar to the trustees? And this question makes it necessary to enquire into and define the nature of that estate. And in doing this we cannot do better than by resorting to approved text-writers for the definition given of the estate.

The deed from Stigar to the trustees, as we have already seen, conveyed the estate in fee, but for a special and particular use and purpose. This *Blackstone (Bk.* 2, p. 109) defines as a base or qualified fee, and which must determine whenever the qualification annexed to it is at an end. This he illustrates by an example: "As, in the case of a grant to A. and his heirs, tenants of the Manor of Dale; in this instance, whenever the heirs of A. cease to be tenants of that manor, the grant is entirely defeated.'' This estate is a fee, says the author, ''because by *possibility* it may endure forever in a man and his heirs; yet as that duration depends upon the concurrence of collateral circumstances, which qualify and debase the purity of the donation, it is therefore a qualified or base fee.''

And so Chancellor KENT, in his *Commentaries* (vol. 4, p. 9,) gives the same definition of a base or qualified

fee. He treats the subject under the head of *qualified, base or determinable fee.* Within the definition stated, the author says, "the proprietor of a qualified fee has the same rights and privileges over the estate as if he were a tenant in fee simple; all the estate is in the feoffee or grantee, notwithstanding the qualification, and no remainder can be limited over, nor any reversion expectant thereon, other than the *possibility of a reverter* when the estate determines, or the qualification ceases." And to the same effect is *Preston on Estates, vol.* 1, *pp.* 431, 481.

It is clear therefore that after a conveyance of a base or qualified fee, as in this case, the grantor retains no such reversionary interest as will give him any control of or right to interfere with the land granted. All that remains in him is the *mere possibility* of reverter. And whether that *mere possibility* of reverter to Andrew Stigar or his heirs was such an estate or interest in reversion, remainder or trust, or in which he had any such claim or interest as might have been subjected to the payment of his debts, under the terms of the Act of 1774, ch. 28, would seem, upon principle, to be a question of great doubt. Looking to the manner in which the grantees, and subsequent Legislatures, have regarded and dealt with the estate, it may well be presumed that neither the assignee of Stigar, nor those represented by such assignee, ever regarded such *mere possibility of reverter* as constituting any part of the available assets of the insolvent debtor. For while the real estate of the insolvent appears to have been sold and conveyed by the assignee, as required by the statute, there does not appear the slightest trace of any attempt to sell or deal with this mere possibility of reverter, in any manner or form whatever. It is clear the assignee took no beneficial interest in the estate; and if he had dealt with this possible reverter, and had sold it as part of the estate of the

insolvent, a deed of conveyance would have been neces-
sary, and, under the law, it would have been neces-
sary to record that deed; and such deed would be the
only evidence of the transfer of title to a purchaser.
But no such deed is found or produced, and no one has
been designated as having acquired such title.    And
from the great lapse of time, now more than a century,
the trust under the insolvent Act must be presumed to
have been long since closed, and this mere right of
possibility of reverter left in the original grantor.    That
such presumption ought to be made is clearly established
by decided cases.    *Syester, Trustee of Cushwa vs. Brewer,
et al.*, 27 *Md.*, 289; *Kip, et al. vs. Hirsh*, 103 *N. Y.*, 565.
The defendant having set up this supposed outstanding
title or right of entry as a defence, it is incumbent upon
her to establish the existence of such outstanding title
or right of entry, *by clear and definite evidence.*    As has
been said by this Court, it is not incumbent on the
plaintiff to negative the existence of such outstanding
title, but it is the duty of the defendant to make its
existence clear and certain, in order to make it available
as a defence.    *Lannay's Lessees vs. Wilson*, 30 *Md.*, 546;
*Greenleaf's Lessees vs. Birth*, 6 *Pet.*, 302.    In the last case
mentioned, that reported in 6 *Pet.*, 302, the defence was
there as it is here, that the title was divested and out-
standing, by virtue of an insolvent proceeding had under
the Act of this State of 1798, ch. 64, respecting insol-
vent debtors; but because the deed of assignment was
not duly recorded, as required by the laws of this State,
it was held that the deed was a nullity, and that the
title was not divested out of the insolvent, (Greenleaf);
and therefore that there was error in admitting the
proceedings under the insolvent laws, and in instructing
the jury that the proceedings showed a legal title out
of the plaintiff, (Greenleaf,) and precluded a recovery
in the suit.    It is clear, therefore, that the insolvent

proceedings relied on, under the Act of 1788, ch. 17, furnished no legal ground of defence, and that the Court below was entirely correct in rejecting the eleventh and twelfth prayers of the defendant.

3dly. We are next presented with the contention by the defendant, that though it may be that the ground in controversy is part of the lot conveyed by Stigar to the trustees in 1773, and that the insolvent proceedings under the Act of 1788, ch. 17, did not operate to divest Stigar of the *possibility of reverter* under his deed to the trustees, yet, by the operation of the Declaration of Rights of this State, adopted in 1776, the deed by Stigar to the trustees was nullified, and the trustees of the Quakers thenceforth held the ground *adversely* to Stigar and his heirs, and therefore the heirs of Stigar have lost their right of entry for a diversion of the use of the property granted by the deed of 1773.

There is certainly no foundation for this contention. In the first place, the quantity of land conveyed by the deed of Stigar to the trustees in 1773, was only 102½ square perches of land; and this deed was first in point of time that was made to the Quakers, according to the recitals of title as made in the deed of Hopkins and others, trustees, to Isaac Tyson and others, trustees, dated the fourth of April, 1880. And by the provision of the Declaration of Rights, there was an express exception made from the general declaration, that all gifts, sales or devises of land, for the use of any religious sect or denomination, should be void, without the leave of the Legislature, of "any sale, gift, lease or devise of any quantity of land not exceeding two acres, for a church, meeting or other house of worship, and for a burying ground, *which shall be improved, enjoyed or used, only for such purpose;* or such sale, gift, lease or devise, shall be void." There is no suggestion made, or proof to show, that the Quakers did not improve and use the

premises conveyed, for the purposes specified in the deed. But if there had been delay or omission in that respect, the Act of 1793, ch. 20, would seem to be ample, by fair construction, to cure the omission or effect of delay.

But supposing that not to be so, the deed of Stigar to the trustees was made before the adoption of the Declaration of Rights, and when there was no prohibition as to sales, gifts or devises for the use of religious sects or denominations; and unless the terms of the Declaration of Rights be given a retroactive operation, they can have no application to the deed of Stigar to the trustees, made in 1773.

The terms in the clause of the Declaration of Rights were certainly very general and comprehensive, and a literal reading of them would not confine their operation to the then future; but a construction that would divest vested rights ought not to be adopted in any case, except upon the most imperative language; and the rule is too well established to admit of question, that a retroactive operation of the language of constitutions or statutes, when vested rights may be impaired, will always be avoided if possible. This is well illustrated by cases occurring immediately after the enactment of the Statute of Frauds. The language of that Statute is, that no. action *shall be brought* to charge any person on any agreement made in consideration of marriage, unless the agreement be in writing; and it was held not to apply to an agreement which had been made before the statute was passed. *Gilmore vs. Shuter*, 2 *Lev.*, 227; *Ash vs. Abdy*, 3 *Swanst.*, 664. And so in regard to the Mortmain Act, on terms even stronger than those of the Statute of Frauds, in their application to past devises, it was held not to apply to a devise made before the Act was passed. *Atty-Genl. vs. Lloyd*, *et al.*, 3 *Atk.*, 551. We think it clear, therefore,· that the clause in the Declaration of Rights has no.application to the deed from Stigar to the

trustees made in 1773; and consequently there is an unbroken privity of estate between the defendant and the grantor in that deed. And that being the case, and the defendant tracing her title through the trustees of the Quakers, as derived by them from Andrew Stigar, the recitals in the deed under which she entered and holds possession of the land are binding upon her; and those recitals show how and under whom she claims. It is not necessary in this case to hold that these recitals have the effect of a technical estoppel operating upon the estate, but they are solemn admissions furnished by the muniments of title under which the defendant entered and holds possession of the property. In other words, they point to the source, and display the power and authority under which the title was conveyed to the defendant. The cases upon this subject are fully collected, and the doctrine well stated, in 3 *Washb. on R. P.*, pp. 93 to 100 inclusive. The deed by the trustees to the defendant, having been fully authorized to be made by the Act of 1874, ch. 390, referred to in the deed, was valid so far as the grantors were concerned, and they were concluded thereby; and the defendant having accepted the deed, entered into possession, and is still holding under that deed, without the slightest ground for a pretence of having acquired a paramount title, she is not at liberty to deny the validity of the title conveyed by the deed. Where both parties assert title from a common grantor, and no other source, neither can deny that such grantor had a valid title when he executed the original conveyance under which both parties claim. The grantee cannot enter and hold under a deed, and at the same time repudiate the title thereby conveyed. *Cowell vs. Springs Co.*, 100 *U. S.*, 55, 61; *Robertson vs. Pickrell*, 109 *U. S.*, 608, 615. It follows that the Court below committed no error in refusing to grant the first, sixth, seventh, eighth, ninth, and tenth prayers offered by the defend-

ant.    And while the interest in reverter was a mere
possibility, non-claim on the part of the heirs of Andrew
Stigar in no way operated to their prejudice; and it was
only after the deed made, and actual diversion of the use
of the property, in 1882, that the estate by way of
reverter accrued, and the right of entry became perfect.
No actual entry upon the premises, or demand of posses-
sion thereof, before action brought, was necessary.    The
bringing of the suit for the property by the proper
parties is all that was required by way of demand. *Gwynn
vs. Jones,* 2 *G. & J.,* 173, 183; *Ruch vs. Rock Island,* 97
*U. S.,* 693, 696.

4th.  We are next brought to the question raised by
the defendant, that the plaintiffs have not proven them-
selves to be heirs-at-law of Andrew Stigar, and entitled
to the estate by reverter, according to law and the
established rules of evidence.

There was evidence certainly tending to prove the
descent of the plaintiffs from Andrew Stigar, deceased,
and that they were heirs entitled to claim.    But
whether the proposition was put to the jury in such form
as would properly guide them in the inquiry, is another
question.    The jury were instructed by the plaintiffs'
first prayer that if they found the plaintiffs to be
*descendants and heirs-at-law* of Andrew Stigar, and that
said Stigar made the deed of 1773, etc., then the land
reverted to the heirs-at-law of Andrew Stigar, and the
plaintiffs were entitled to recover such undivided inter-
ests as the jury might find they represented as heirs-at-
law.

This instruction was greatly calculated to mislead the
jury.    Descendants might not be heirs-at-law capable
of making entry; and the jury might infer that any de-
scendants were heirs.    Of the plaintiffs claiming here,
some are of the third, fourth and fifth generations.  Who
were heirs entitled to recover was strictly a question of

law to be determined by the Court ; and the facts only upon which their respective claims rested should have been submitted to the jury. The principle is, that the plaintiff in the action of ejectment, when suing as heir-at-law, must prove his descent from the ancestor from whom he claims, and must show that all the intermediate heirs are dead without issue. The case of *Sprigg vs. Moale*, 28 *Md.*, 497, was a case founded upon collateral descent, but the general principle there stated applies in this case. The plaintiffs must remove every possibility of title in another person, *in the line of descent before he can recover;* no presumption being admitted against the person in possession. "In order to show the death of all nearer heirs, it is necessary to negative the coming into existence of those who would be such. That without the establishment of the non-existence of issue as a distinct species of fact from that of death, the proof of heirship would be defective, will thus appear: If A. be a nearer heir than the claimant, and it be proved that he died, having had two children, B. and C., and the deaths of these children be also proved, the claimant is not entitled to succeed if issue of either B. or C., or if other issue of A. be extant. Evidence may be adduced of the deaths of all the known members of senior branches through successive generations, and still the task will follow of satisfying those who are to decide, that no issue exists of the lowest or latest descendants, added to that of establishing of each individual member that he had no other children than those who have been accounted for." *Hubback, Law of Succession*, 199.

We think the first prayer of the plaintiffs should not have been granted in the form in which it was offered; and we also think the fourth prayer of the plaintiffs was too general, and was calculated to mislead, and should therefore have been rejected.

The motions of the defendant to strike out the testimony of witnesses Shuter and McLean, were properly

Kelso *vs.* Stigar, *et al.*

overruled. And so the motion by the defendant to strike out the name of Ellis Skillman, one of the plaintiffs, upon the ground as asserted, that he had not authorized the use of his name in bringing the suit, was properly overruled. Unless there had been fraud or imposition practiced, or the party himself had made objection to the use of his name, the Court will not assume that the attorney bringing the suit had acted without authority. It has long been the established practice in this State, as it has been elsewhere, that when an attorney brings a suit or takes upon himself to appear for a party, the Court will not look further, but act upon the presumption that the attorney has authority for his action. *Jackson vs. Stewart,* 6 *John.,* 34.

With respect to the rulings excepted to in the third, fourth and fifth bills of exception by the defendant, on the theory upon which the case was tried below as to locations, we think there was error. It was certainly not competent or allowable to a surveyor to assume the function of the Court, and to give an opinion as to how a deed should be construed, with a view to a proper location of it, or what was the proper location of a particular deed or grant, having reference to other deeds in the case. That was a question of law for the Court.

Upon review of the whole case it follows from what we have said, that the judgment must be reversed, and a new trial awarded.

*Judgment reversed, and
new trial awarded.*